Michael D. White
601 West 5th Avenue, Ste. 700
Anchorage, Alaska 99501
Telephone: (907) 263-6380
Facsimile: (907) 263-6345
E-mail: mwhite@pattonboggs.com

Benjamin G. Chew
Andrew M. Friedman
Douglas C. Proxmire
2550 M Street, N.W.
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Email: bchew@pattonboggs.com
afriedman@pattonboggs.com
dproxmire@pattonboggs.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SUULUTAAQ, INC. and SAMUEL BOYLE, <br><br> Plaintiffs, <br><br> v. <br><br> LANCE WILLIAMS, CENTER FOR INVESTIGATIVE REPORTING, and SAN FRANCISCO CHRONICLE, <br><br> Defendants. | Case No.: 3:10-cv _____ <br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Suulutaaq, Inc. ("Suulutaaq") and Samuel Boyle ("Mr. Boyle"), by and through undersigned counsel, hereby bring this Complaint for defamation against Defendants Lance Williams ("Williams"), the Center for Investigative Reporting ("CIR") and the *San Francisco Chronicle* ("the *Chronicle*"), seeking injunctive relief and compensation for damages to their personal, professional and corporate reputations, and alleging as follows:

## The Parties

1. Suulutaaq is an Alaska Native Corporation ("ANC") that began pursuing federal contracts, like other Native Enterprises, in order to alleviate some of the economic disadvantage and poverty in the isolated and rural villages of its region, and to fund further cultural preservation. Suulutaaq has successfully completed construction projects obtained both through the Native 8(a) Small Business Administration program and through other sources. Suulutaaq is currently the prime contractor and performing work on portions of a substantial flood control project in Napa Valley, California.

2. Mr. Boyle has served as the CEO for TKC Aerospace for the past four and a half years. He also served as the transitional CEO for Suulutaaq during a reorganization of the management team. That appointment lasted less than one year. He currently resides in Mount Pleasant, South Carolina.

3. Williams is a news reporter who resides in California.

4. CIR is an investigative news reporting organization headquartered in Berkeley, California. CIR's intended audience is both "local and global." CIR founded California Watch, a subsidiary entity that employs Williams and initially published the defamatory article at issue in this case on its internet website.

5. The *Chronicle* is the largest newspaper in Northern California and one of the largest newspapers in the United States, with a daily circulation of hundreds of thousands of copies, as well as a website that is among the most active newspaper websites in the United States. The Chronicle is owned by national media giant the Hearst Corporation.

## Jurisdiction and Venue

6. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that the action is between citizens of Alaska and citizens of foreign states, and the amount in controversy exceeds $75,000,

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al,* Case No.: 3:10-cv _____
Page 2 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 2 of 13

exclusive of interest and costs, and pursuant to 28 U.S.C. § 2201, in that a genuine controversy exists between Plaintiffs and Defendants.

7. Venue in this District is proper pursuant to 28 U.S.C. § 1391 in that one of the Plaintiffs resides in this District and a substantial part of the harm incurred by the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

8. Suulutaaq and Mr. Boyle are aggrieved by Defendants' defamatory statements of fact that have resulted in injuries sustained by the Plaintiffs in Alaska and elsewhere.

## Facts Common to All Counts

9. Williams authored the defamatory article at issue in this case ("Williams Article" or "the Article"). Williams worked for more than three decades at the *San Francisco Examiner*, the *Oakland Tribune*, and most recently, the *Chronicle*.

10. On January 30, 2010, CIR published the Williams Article on its website, CaliforniaWatch.org, under the headline "Federal stimulus program pours $54 million into Wine Train project." As of the date this Complaint was filed, the Williams Article remains on CaliforniaWatch.org. [Attach. A.]

11. On January 31, 2010, the *Chronicle*, which has a daily circulation of over 300,000 copies, re-published the entire Williams Article on Page A1 of the print edition. [Attach. B.]

12. The *Chronicle* also re-published the entire Williams Article on its website, SFGate.com. As of the date this Complaint was filed, the Williams Article remains on SFGate.com. [Attach. C.]

## The Williams Article Is Defamatory

13. The Williams Article defames Plaintiffs by making false statements; juxtaposing statements to lead ordinary readers to false and defamatory conclusions; and, leading ordinary readers to false and defamatory conclusions by omitting material facts.

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al*, Case No.: 3:10-cv _____
Page 3 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 3 of 13

14. Taken as a whole, the Williams Article is defamatory of Mr. Boyle because it leads ordinary readers to conclude he is an incompetent businessman and a dishonest person who violated federal lobbying laws and regulations, and manipulated federal laws and regulations related to ANCs, to win government contracts for Suulutaaq.

15. All of the foregoing implications are false and damaging to Mr. Boyle's reputation.

16. Taken as a whole, the Williams Article is defamatory of Suulutaaq because it leads ordinary readers to conclude Suulutaaq: does not deserve the federal contracts it has been awarded, including a multi-million dollar flood control contract in Napa, California ("Napa Contract"); is incompetent to perform the Napa Contract, for which the government overpaid; only won the Napa Contract by manipulating federal laws and regulations related to ANCs and by violating federal lobbying laws and regulations; and, is performing almost no work on the Napa Contract, but is delegating virtually all the work on the Napa Contract to subcontractors while retaining a large percentage of the funds.

17. All of the foregoing implications are false and damaging to Suulutaaq's reputation.

18. Defendants knew or should have known the Williams Article would lead ordinary readers to these false and defamatory conclusions.

19. In early January 2010, Williams submitted a series of written questions to Mr. Boyle and Suulutaaq, who voluntarily provided lengthy written responses on January 12 and January 13, respectively—more than two weeks before the Williams Article was published. The Williams Article, however, consistently omits and mischaracterizes the facts provided by the Plaintiffs, instead misleading ordinary readers to false and defamatory conclusions.

### The Williams Article Defamed Mr. Boyle

20. Regarding Mr. Boyle, the Williams Article claims a previous venture in which he was involved, "a dot-com for sail boaters [ ] collapsed in bankruptcy." The Williams Article quotes an

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 4 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 4 of 13

"investor aggrieved over the bankruptcy": "[I]f Sam Boyle is involved, watch out. I would not invest a nickel with this guy." Another disappointed investor describes Mr. Boyle as "a good talker, but a lousy businessman." The Williams Article further states, "Under Boyle, Sailnet burned through more than $13 million in venture capital, company documents show, but it never made a profit."

21. These statements are defamatory because they lead ordinary readers to the false and defamatory conclusions that Mr. Boyle is an incompetent businessman and a dishonest person who conned people into investing in Sailnet, wasted $13 million, and personally caused the company to fail through mismanagement and poor business judgment.

22. In truth, and as Mr. Boyle explained to Williams in his written statement on January 12, Sailnet was governed by a board of directors, who made all business strategy decisions; Mr. Boyle simply followed their instructions. When Mr. Boyle left Sailnet, more than seven months before it went bankrupt, the company was not in immediate danger of bankruptcy. Subsequent decisions by the board of directors led directly to Sailnet's bankruptcy. Further, Sailnet went bankrupt at a time when hundreds if not thousands of other similar ventures failed—the bursting of the so-called dot-com bubble. Mr. Boyle is grieved by the failure of Sailnet, as he and his wife also lost everything they put into the venture. But the Williams Article ignores and misconstrues all of this information, which was available to Williams more than two weeks before publishing the Article via Mr. Boyle's January 12 written statement. Instead, the Williams Article falsely places all the blame for Sailnet's bankruptcy at Mr. Boyle's feet and mischaracterizes his description of the bankruptcy as a "tragedy."

23. Without discussing or even mentioning any of his extensive business management experience, the Williams Article describes Mr. Boyle as "a former consultant for government agencies." The Williams Article continues, "After leaving Sailnet, Boyle wrote that he was hired as a consultant at TKC Aerospace and in 2005 became CEO. In all, TKC Aerospace has obtained $117

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv _____*
Page 5 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 5 of 13

million in contracts." The Williams Article does not mention any relevant details regarding the awarding of these contracts.

24. This statement leads ordinary readers to the false and defamatory conclusion that Mr. Boyle's sole value to Suulutaaq is an ability to obtain undeserved federal contracts through illicit means, in violation of federal lobbying statutes and regulations.

### The Williams Article Defamed Suulutaaq

25. Regarding Suulutaaq, the Williams Article states, "Because the company was founded by Alaska natives, it enjoys special access to federal contracts. That's how it obtained one of the biggest federal stimulus contracts in California."

26. This statement is false and malicious. Suulutaaq won the Napa Contract on its own merits—not "because" it is an ANC. Further, this contract was awarded in September 2008, months before Congress even passed the federal stimulus legislation (and before Mr. Boyle began serving as Suulutaaq's interim President); the Napa Contract is not a "federal stimulus contract." The additional federal stimulus funding had nothing to do with Suulutaaq's status as an ANC.

27. This statement is defamatory because it leads ordinary readers to the false and defamatory conclusion that Suulutaaq does not deserve the Napa Contract, and only received it as an affirmative action set-aside.

28. The Williams Article further states, "Experts say tribal corporations often get into federal contracting by hiring consultants in the lower 48 states who have connections with contracting officers." But as Suulutaaq explained to Williams in its written statement of January 13, Suulutaaq did not attempt to influence any local, state or federal employee, agency or legislator to determine that the Napa Contract should be: 1) a set-aside of any kind or 2) reserved for Suulutaaq in any manner. The Williams Article falsely claims Suulutaaq "rebuffed a query about whether Suulutaaq employed lobbyists."

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv _____*
Page 6 of 13
Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 6 of 13

29. Moreover, Mr. Boyle, whose vastly overstated government connections are underscored in the Williams Article, was not even a Suulutaaq executive when Suulutaaq obtained the Napa Contract.

30. The omission of this information from the Williams Article, all of which was available to Williams via Suulutaaq's written statement more than two weeks before publishing the Article, and the inclusion of the above statement, leads ordinary readers to the false and defamatory conclusion that Suulutaaq, in violation of federal lobbying statutes and regulations, used illicit means to obtain the Napa Contract.

31. The Williams Article also states, "Suulutaaq is one of dozens of Alaska Native corporations that have emerged as players in federal contracting via measures crafted in the 1980s and 1990s by former U.S. Sen. Ted Stevens, R-Alaska, a powerful lawmaker whose career ended with a contracting scandal." Suulutaaq is an ANC, and Senator Stevens' career did not end because of a government contracting scandal, but rather, Senator Stevens allegedly did not report construction work on a home in Alaska – a project that did not involve Suulutaaq (or any other ANC for that matter) in any way, shape, or form.

32. The juxtaposition of these statements leads ordinary readers to the false and defamatory conclusion that Suulutaaq, in violation of federal statutes and regulations, used illicit means to obtain the Napa Contract.

33. The Williams Articles states Suulutaaq was formed in 1977 by Alaska natives "to develop a nearby goldfield." The Williams Article continues, "In April 2006, Suulutaaq negotiated a federal contract: $68,000 to replace a sewage pump at McClellan Air Force Base near Sacramento. Four months later, it obtained a $14.1 million, no-bid contract to rebuild meat lockers in Honolulu for the U.S. Defense Commissary Agency, which runs supermarkets on military bases."

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 7 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 7 of 13

34. The juxtaposition of these statements, and the omission of any discussion of Suulutaaq's extensive experience relevant to the award of the Napa Contract, leads ordinary readers to the false and defamatory conclusion that Suulutaaq does not deserve the Napa Contract, is unqualified to manage the project, and only received the Napa Contract as an affirmative action set-aside.

35. The Williams Article further claims, "A few months after Suulutaaq got its contract, the federal stimulus program was announced. The corps recommended the project, hoping to further speed its completion. With the support of U.S. Rep. Mike Thompson, D-Napa, $54 million in stimulus funds also went to Suulutaaq."

36. But as with the original contract, and as Suulutaaq explained to Williams in its written statement of January 13, Suulutaaq did not attempt to influence any local, state or federal employee, agency or legislator—including Congressman Thompson—to obtain stimulus money for the Napa Contract. Indeed, the Congressman himself flatly refutes the Article's allegations regarding this issue.

37. These statements, coupled with the omission of this information, which was available to Williams via Suulutaaq's written statement more than two weeks before publishing the Article, leads ordinary readers to the false and Suulutaaq obtained the stimulus funding by illicit means, in violation of federal lobbying statutes and regulations.

38. The Williams Article quotes a local engineer to the effect that, "the quality of the construction is first rate . . . because Suulutaaq subcontracted much of the job to the giant Peter W. Kiewit & Co. engineering firm". The local engineer continues, "The reality is Suulutaaq isn't doing much. They've got some staff on the job, and they're running some subs, but Kiewit is doing the work."

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 8 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 8 of 13

39. The Williams Article omits that Suulutaaq is exceeding the federal requirements for self-performance on the Napa Contract, which fact Suulutaaq communicated to Williams in its January 13 written statement. Instead, the Williams Article utterly mischaracterizes Suulutaaq's statement: "In its statement, Suulutaaq said the company was complying with federal law regarding hiring subcontractors." It also misleadingly implies that Kiewit is performing all the work on the project, when the reality is that Suulutaaq is performing over 40% of the work.

40. These false statements, coupled with the omission of this relevant information, which was available to Williams via Suulutaaq's written statement more than two weeks before publishing the Article, leads ordinary readers to the false and defamatory conclusion that Suulutaaq is incompetent to perform the Napa Contract itself and is violating federal regulations by hiring an excessive number of subcontractors.

41. The Williams Article quotes the same local engineer: "It would have been a hell of a lot cheaper if they had put [the Napa Contract] out to bid." The Williams Article adds, "Suulutaaq is keeping about $20.4 million, or 38 percent of the total." As discussed above, Suulutaaq is performing over 40% of the work on the Napa Contract.

42. These false statements lead ordinary readers to the false and defamatory conclusion that the government overpaid for the Napa Contract, and that Suulutaaq is unjustifiably "keeping" $20 million in unearned profits after subcontracting out all of the work.

43. Because all of the foregoing false statements were made with knowledge of their falsity, due to Suulutaaq and Mr. Boyle's responses to Williams's written questions, all of the foregoing false statements were made with reckless indifference to the Plaintiffs' respective reputation.

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 9 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 9 of 13

## Count I

### (Defamation of Plaintiff Samuel Boyle)

44. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

45. The Williams Article defamed Mr. Boyle because it leads ordinary readers to the false and defamatory conclusions that he is an incompetent businessman and a dishonest person who violated federal lobbying laws and regulations, and manipulated federal laws and regulations related to ANCs, to win government contracts for Plaintiff Suulutaaq, Inc.

46. Defendants knew or should have known that the Williams Article contains numerous facts that are false in the context in which they appear and numerous misleading omissions that would lead ordinary readers to false and defamatory conclusions.

47. On January 12, 2010, more than two weeks before the Article was published, Mr. Boyle voluntarily provided extensive written responses to written questions from Williams, which the Williams Article consistently omits and mischaracterizes.

48. By the conduct outlined above, and as a direct and proximate result of Defendants' authorship, publication, and re-publication of the Williams Article, Mr. Boyle has suffered irreparable damage to his personal and professional reputations in an amount not less than $2,000,000, the exact amount to be proven at trial.

## Count II
### (Defamation of Plaintiff Suulutaaq, Inc.)

49. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 48 as though fully set forth herein.

50. The Williams Article is defamatory of Suulutaaq because it leads ordinary readers to the false and defamatory conclusions that Suulutaaq: does not deserve the federal contracts it has been awarded, including the Napa Contract; is incompetent to perform the Napa Contract, for

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 10 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 10 of 13

which the government overpaid; only won Napa Contract and other contracts by manipulating federal laws and regulations related to ANCs and by violating federal lobbying laws and regulations; and, is not performing the federally required amount of work on the Napa Contract, but is delegating the entire project to subcontractors while retaining an unjustifiable percentage of the funds.

51. Defendants knew or should have known that the Williams Article contains numerous facts that are false in the context they appear and numerous misleading omissions that would lead ordinary readers to these false and defamatory conclusions.

52. On January 13, 2010, more than two weeks before the Article was published, Suulutaaq voluntarily provided extensive written responses to written questions from Williams, which the Williams Article consistently omits and mischaracterizes.

53. By the conduct outlined above, and as a direct and proximate result of Defendants' authorship, publication, and re-publication of the Williams Article, Suulutaaq has suffered irreparable damage to its corporate reputation in an amount not less than $6,000,000 or in such a greater amount to be prove at trial.

## Count III
### (Punitive Damages for Defamation of Plaintiff Samuel Boyle)

54. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 53 as though fully set forth herein.

55. Because the Defendants knew the defamatory statements made against Samuel Boyle were false and misleading, Defendants authorship, publication, and re-publication of the Williams Article was outrageous, and constitutes evidence that Defendants acted with malice, bad motive, and with reckless indifference to Mr. Boyle's personal and professional reputation.

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 11 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 11 of 13

56. By the conduct outlined above, and as a direct and proximate result of Defendants' conduct, Mr. Boyle is entitled to punitive damages in the amount of not less than $6,000,000, the exact amount to be proven at trial.

## Count IV
### (Punitive Damages for Defamation of Plaintiff Suulutaaq, Inc.)

57. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 56 as though fully set forth herein.

58. Because the Defendants knew the defamatory statements made against Suulutaaq were false and misleading, Defendants authorship, publication, and re-publication of the Williams Article was outrageous, and constitutes evidence that Defendants acted with malice, bad motive, and with reckless indifference to Suulutaaq's corporate reputation.

59. By the conduct outlined above, and as a direct and proximate result of Defendants' conduct, Suulutaaq is entitled to punitive damages in the amount of $18,000,000 million, the exact amount to be proven at trial.

## Jury Demand

Plaintiffs respectfully request a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that the Court award them the following relief:

1. That Plaintiff Samuel Boyle be awarded special, compensatory, punitive and general damages for his claims against the Defendants in an amount not less then $8,000,000, or such greater amount as proven at trial;

2. That Plaintiff Suulutaaq, Inc. be awarded special, compensatory, punitive and general damages for its claims against the Defendants in an amount not less then $24,000,000, or

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv _____*
Page 12 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 12 of 13

such greater amount as proven at trial.

3. That Plaintiffs be awarded their reasonable attorney's fees, costs and interest;

4. For an Order from this Court requiring the Defendants to acknowledge that the Williams Article is defamatory;

5. For an Order from this Court requiring the Defendants to retract the Williams Article and issue apologies to Plaintiffs;

6. For such other relief as the Court deems just and proper.

Dated this 10th day of March, 2010 at Anchorage, Alaska

PATTON BOGGS LLP
Counsel for Plaintiffs
Sam Boyle and Suulutaaq, Inc.

By: _____
Michael D. White
601 West 5th Avenue, Ste. 700
Anchorage, Alaska 99501
Telephone: (907) 263-6380
Facsimile: (907) 263-6345
mwhite@pattonboggs.com
[AK Bar No.: 8611144]

025328.0107\66401.06

COMPLAINT
*Suulutaaq, Inc., et al. vs. Lance Williams, et. al, Case No.: 3:10-cv* _____
Page 13 of 13

Case 3:10-cv-00048-TMB   Document 1   Filed 03/10/10   Page 13 of 13